UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  07-20293-CIV-SEITZ/MCALILEY

SM LICENSING CORP.,

      Plaintiff/Counter-Defendant,

v.

U.S. MEDICAL CARE HOLDINGS
LLC and DR. SASSON MOULAVI,

      Defendants/Counter-Plaintiffs,

v.

DR. SANFORD SIEGAL,

      Third Party Defendant.
_____/

## **PRELIMINARY INJUNCTION**

The Court has before it competing motions for preliminary injunction.  The underlying dispute is between two physicians, both of whom specialize in weight loss and claim the common law right to the trademark "Cookie Diet."  The parties agree on this: only one of them can own the trademark, and the owner is entitled to a preliminary injunction that enjoins the other from using the mark.  Although the dispute is focused, and does not require the Court to undertake many of the inquiries typically needed for entry of a preliminary injunction, it requires the Court to carefully consider the application of a number of principles of common law trademark to some unusual factual circumstances.

I.      **Undisputed Facts**

Certain basic facts are not in dispute.

The Plaintiff, SM Licensing Corporation ("SM Licensing"), is a Florida corporation [DE 89, ¶1]; Third-Party Defendant Dr. Sanford Siegal is its president.  [DE 82, pp. 174-75]. Siegal is a licensed physician who specializes in weight loss, and who has been practicing medicine in the greater Miami area since 1957.  [DE 82, pp. 32-33, 35, 150, 192].  In 1975, Siegal developed and began to offer patients a proprietary weight management program, an 800-calorie diet where the patient eats one meal a day, a prescribed calorie dinner, and replaces all other meals with six specially formulated cookies that suppress hunger.  [DE 89, ¶¶ 6, 7; DE 82, pp. 36-39, 41].  Siegal offered this diet to his patients through his medical practice, the Siegal Medical Group, which operated a number of clinics.  [DE 82, pp. 35, 199].  By the early 1990's the Siegal Medical Group employed doctors at fourteen South Florida clinics that offered the diet [DE 82, pp. 48, 52].  Today the Siegal Medical Group operates three clinics.  [DE 82, p. 192; DE 83, p. 192].

Siegal created the formulation of the cookies, which includes proteins and amino acids that suppress hunger, and the recipe is a trade secret known only to Siegal and his wife.  [DE 89, ¶ 8; DE 82, pp. 39-41].  In time, Siegal incorporated the Clinic Supply Corporation, a Florida company that operates a bakery that produces and sells the cookies and other affiliated products used by Siegal's patients.  [DE 82, p. 49].[1]

---

[1] Siegal also formulated shakes, soups and drops used in his diet.  The cookie, however, remains the core product.  [DE 82, p. 96; Pl. Ex. 46, p. 1].

Defendant Dr. Sasson Moulavi is a Canadian physician trained in family and bariatric medicine [DE 89, ¶ 11], and licensed to practice medicine in Florida.  [DE 83, p. 121].  In the summer of 2002, when Moulavi was investigating medical practices he might purchase and operate in the United States, he was introduced to Siegal.  [DE 82, p. 89; DE 83, p. 121; DE 89, ¶ 10].  This led, in June 2002, to Moulavi and his company U.S. Medical Care, Inc., a Florida corporation, entering into a licensing agreement with Siegal Weight Management, Inc., a Florida corporation controlled by Siegal.  [DE 89, ¶ 12; Pl. Ex. 44].[2]  The agreement gave Moulavi an exclusive license to use Siegal's diet and certain of his intellectual property throughout the United States and Canada, in exchange for a fee and royalty.  [DE 89, ¶ 13; Pl. Ex. 44].  It authorized Moulavi's company to open weight-loss centers using the Siegal name, to sell weight-loss products that Moulavi agreed to purchase exclusively from Siegal, and to use in its advertising the 40-year history of Siegal's diet program.  [DE 89, ¶ 14, 15; Pl. Ex. 44].  The agreement reserved to Siegal the right to operate his clinics and sell his products in the South Florida counties of Miami-Dade, Broward, Collier and Monroe.  [DE 89, ¶16; Pl. Ex. 44].

The 2002 agreement required that Moulavi own at least 51 percent of the weight-loss centers he opened, which Moulavi found made it difficult to recruit investors.  [DE 83, pp. 155-56; Pl. Ex. 44].  The parties addressed this problem by amending the agreement, on August 1, 2003, to permit U.S. Medical Care Holdings, LLC (U.S. Medical), a company

---

[2] For the sake of simplicity, throughout this order the Court often refers to Siegal and Moulavi, rather than their respective corporate entities.

controlled by Moulavi and his wife, and a Defendant in this action, to sublicense rights to centers in which Moulavi did not have a controlling interest.  [DE 89, ¶ ¶ 3, 5; Def. Ex. 5].

Siegal and Moulavi entered into a second agreement, the License and Supply Agreement dated September 27, 2004.  [DE 89, ¶ 17; Pl. Ex. 46].  In that agreement Siegal's company, SM Licensing, franchised to Moulavi certain of Siegal's trademarks and his weight-loss program, and continued to license them to Moulavi.[3]  Moulavi, in turn, was authorized to sub-franchise and sub-license Siegal's trademarks and weight-loss program.  [DE 82, pp. 101-02; DE 84, pp. 13-15; Pl. Ex. 46].  On the same date, Moulavi and Siegal entered into a Consulting Agreement, whereby Siegal agreed to provide business operations training to Moulavi and to make personal appearances at Moulavi's weight-loss centers.  [DE 83, p. 161; DE 84, p. 48; Def. Ex.7].

The 2002 and 2004 agreements licensed to Moulavi the following trademarks:  Siegal, Siegal Medical Group, Siegal Medical Weight Management, Siegal Diet Program, Siegal System, Siegal Cookie, Siegal Shake and Siegal Drops (the "Siegal trademarks") [Pl. Ex. 44, 46].  Neither agreement made any mention of the trademark Cookie Diet.

Disagreements arose between Moulavi and Siegal, and on August 7, 2006, Moulavi terminated the parties' agreement.  [DE 89, ¶ 26].

---

[3] By the time the parties entered into the 2004 agreement, Siegal had incorporated SM Licensing.  [DE 82, pp. 174-75; DE 89, ¶ 1].  SM Licensing owns the "Siegal" intellectual property that was licensed to Moulavi.  [Pl. Ex. 46].

## II.    Procedural Background

SM Licensing filed suit in this Court on February 5, 2007 [DE 1], along with a motion for preliminary injunction.  [DE 2, 3].  The complaint alleges that well before he met Moulavi, Siegal developed a common law right to the trademark Cookie Diet, which had come to identify Siegal's weight management services and products.  Plaintiff further alleges that since Moulavi terminated the license and franchise agreement, he has unlawfully used the Cookie Diet mark to identify and market his weight-loss services and products, which are identical to those offered by Siegal, and has thereby caused confusion in the marketplace. The complaint alleges nine causes of action, including claims for unfair competition pursuant to section 43(a) of the Lanham Act, Title 15 U.S.C. § 1125(a) (Count II), cyberpiracy under Title 15 U.S.C. § 1125(d) (Count V) and common law trademark infringement and unfair competition (Count IX).  [DE 1].  In addition to damages and permanent injunctive relief, Plaintiff seeks a preliminary injunction restraining Moulavi and U.S. Medical from in any way using the name Cookie Diet in association with their weight-loss services and products.

Defendants responded by filing an answer and counterclaim against SM Licensing, a third-party complaint against Siegal, and a cross-motion for preliminary injunction against both SM Licensing and Siegal.  [DE 29, 30, 31, 47].  In their counterclaim and third-party complaint Defendants claim that beginning in 2002 they developed the trademark Cookie Diet and were the first to use it to identify their weight-loss services and products.  They also claim that before termination of the agreements between the parties, Siegal rejected the use of the Cookie Diet mark in association with his weight-loss services and products because

5

it "belittled the medical basis for the diet." [DE 29, ¶ 24]. According to Defendants, they invested substantial time, money and effort in developing the trademark, and in the process acquired the common law right to that mark. Defendants assert claims under section 43(a) of the Lanham Act, for infringement of common law and Florida statutory trademark rights, and for unfair competition under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.213. [DE 29]. Defendants ask this Court to preliminarily enjoin SM Licensing and Siegal from any further use of the Cookie Diet mark. [DE 30, 31].[4]

After the cross-motions were fully briefed, an evidentiary hearing was held on May 3, 4 and 7, 2007. [DE 82, 83, 84]. The parties then filed a statement of stipulated facts, and respective proposed findings of fact and conclusions of law. [DE 89, 90, 91]. Counsel presented legal argument to the Court on June 12, 2007. [DE 95].

## III.   Findings of Fact

### A.   Siegal's Diet and His "Old School" View of Marketing

By 1977 or 1978 Siegal employed only his cookie diet in his medical weight-loss practice. [DE 82, p. 42]. From the beginning, his patients called the diet the Cookie Diet.[5]

---

[4] On the consent of the parties [DE 54], The Honorable Patricia A. Seitz referred the preliminary injunction motions to the undersigned for final disposition. [DE 55].

[5] Siegal testified:

Our patients invented the term. From the day I first gave someone a cookie, they were saying, "This is the Cookie Diet." What else would they say? If I had given them a hamburger, they would have said it was the hamburger diet. But they said it was the Cookie Diet, because that's what it was.

(continued)

Two of Siegal's patients, one of whom first went on the diet in 1988, and the other in 1998, testified that they had always known the diet as the Cookie Diet. [DE 82, pp. 244-50]. One patient first learned of the Cookie Diet from a neighbor, and the other from an aunt, both of whom had lost weight on the diet. [DE 82, pp. 244, 250]. Both patients testified that Siegal identified his diet as the Cookie Diet. [DE 82, pp. 245, 250]. This use of the term was corroborated by three of Siegal's office managers, who had worked for him for 38, 28 and 26 years, respectively. [DE 83, pp. 8, 14, 20]. They testified that they, Siegal and his patients commonly spoke of his weight-loss program as the Cookie Diet, both inside and outside of his clinics. [DE 83, pp. 9-13, 15-16, 32-33]. Siegal also produced various e-mails from patients and prospective patients who wrote in 2000 and 2001 to inquire about his "Cookie Diet." [DE 82, pp. 80-84; Pl. Ex. 13, 15-19].[6]

---

> And so that became the vernacular, the speech. People would call and say, "I'd like to get the Cookie Diet. Tell me about it."
> The employee would say, "well, here's some of the features of the Cookie Diet." They'd go on and talk about it.
> So this became just commonplace. This is what we talked about all the time in the practice. To this day, it's the Cookie Diet.

[DE 82, p. 43, *see also* pp. 46, 48, 64].

[6] Moulavi's own materials acknowledge that Siegal's diet had been known as the Cookie Diet for many years. For example, his website, www.officialcookiediet.com, in August 2006 said this:

> Dr. Siegal developed The Siegal System™ (which the media and the doctor's own patients affectionately refer to as "The Cookie Diet") more than 30 years ago. He has used it ever since in his South Florida medical practice. He has supervised the weight loss of 500,000 patients since 1957.

[Pl. Ex. 22; DE 82, pp. 143-45].

While Siegal's diet was commonly referred to as the Cookie Diet by patients, staff and even other doctors [*see* DE 82, pp. 55, 60; 85-87; Pl. Ex. 8-12], he did not market or formally identify it by that name. Siegal explained that his medical practice was established in an era when it was considered unprofessional for doctors to advertise, and that he personally "hated doctors advertising." [DE 82, pp. 43-45].

> I felt that if we were to flaunt that name -- and flaunting it means putting it on posters or advertisements or on a shingle outside our office -- that would be so . . . unprofessional. I wanted to be Dr. Siegal and Siegal Medical Group, the old school.

[DE 82, p. 47; *see also* pp. 52, 164, 175]. Thus, Siegal did not promote his diet as the Cookie Diet in advertising,[7] on signs, paperwork or product packaging;[8] instead the use of the term was confined to less formal communication. [DE 82, pp. 45-46, 164, 193, 197; DE 83, pp. 18, 33, 65, 161]. Siegal believed the Cookie Diet sounded too much like a fad diet, and chose to identify his diet as the "One-Meal-A-Day Diet" [DE 82, pp. 162, 193-94; Def. Ex. 2], and his practice as the Siegal Medical Group. [DE 82, p. 47].[9]

---

[7] An exception was Siegal's promotion of the "Siegal Cookie Diet[TM]," apparently for a brief period of time, to people not seriously overweight, who were offered the diet without medical supervision. In 1990 Siegal advertised this non-medical program with fliers he distributed locally that identified the diet as the "Siegal Cookie Diet[TM]." [DE 82, pp. 65-68; Pl. Ex. 3, 4]. Siegal said he used the symbol "[TM]" on the flier on an attorney's advice that it would protect the trademark. [DE 82, p. 67].

[8] Up until the 2006 termination of his agreement with Moulavi, Siegal packaged his cookies in a simple plastic tray with a glassine wrapper imprinted with "Siegal [TM]." [DE 82, pp. 188-89; Pl. Ex. 21a]. Before the 2006 termination, Siegal never labeled any of his products with Cookie Diet.

[9] Siegal established a website in 2003, www.drsiegal.com [DE 82, p. 191], something Moulavi encouraged him to do. [DE 83, p. 158]. Siegal's website said this: "Although you have probably heard of our program as "The Cookie Diet [TM]," it is actually called the One-Meal-a-Day

8

Over his many years of practice, Siegal attracted patients, mostly affluent, from different areas of the United States and South America. [DE 82, pp. 50, 238; DE 83, pp. 10-12, 16, 18]. Of these, many patients came from Ecuador, Nicaragua and Colombia. Siegal also partnered with a Colombian doctor to open clinics – called Centro Medico Siegal – in Barranquilla, Cali, Medellin, Bogota and Cucuta, Colombia. He also opened clinics in Mexico City and Guadalajara, Mexico. [DE 82, p. 50].[10]

By the late 1980's Siegal also marketed his diet and cookies to doctors around the United States, who in turn sold the cookies to their patients. [DE 82, pp. 51, 55, 59; DE 83, pp. 44, 53-54, 64].[11] Siegal gave each of these doctors a manual he wrote, titled "Starting An Obesity Practice." [DE 82, pp. 51, 59, 61; Pl. Ex. 2]. Under the heading "General Philosophy of our Practice," Siegal wrote:

> Our feeling has always been that the most important factors in treating our patients are the success of the treatment and its safety. When a patient achieves a normal weight and does it safely, we have no need to boast about our success either in print or on the air; our walking advertisement does this for us. The cookie has been a key factor in the success of thousands of patients and there are no questions of safety.

Diet." [Pl. Ex. 6; DE 82, pp. 129-38].

[10] Siegal did not present specific evidence as to how many of his patients came from beyond South Florida, their dates of treatment, or where they lived.

[11] Siegal identified doctors in 122 cities and 31 states to whom he sold cookies over the course of his career, although he was not able to identify the dates of those sales, the number of patients treated, or other particulars. [DE 82, pp. 52-55; Pl. Ex. 1]. This aspect of Siegal's business diminished, so that by the time the parties entered into the 2002 agreement, Siegal was marketing his cookies to a handful of these doctors. [DE 82, pp. 55-56, 92, 151]. Siegal discontinued this practice after he entered into the agreement with Moulavi.

In our practice, we attempt to use a "low key" approach to the patient.  We do not allow the patient to forget that we are physicians and that ours is a medical practice.  In spite of all the newspaper ads in our areas, we offer no specials, no giveaways, and no outlandish claims of impossible rates of weight-loss.  We attempt to preserve this low key image by having no slick multi-color literature.  Even our cookie is intentionally packaged neatly but simply and there are no labels on the packages, which immediately confirms to the patient that this is "our" product and not some packaged meal bought from a national company.

[Pl. Ex. 2, p. 1].[12]  The manual included this about the cookie:

The One-Meal-A-Day Diet (copy included) requires six cookies per day, no more, no less.

When new patients call to make an appointment, in more cases than not, they will mention the cookie.  Your receptionist will be told, "I want to go on the cookie diet."

As a method of weight reduction, the cookie is in a sense "cute."  That attracts attention.  When one of our patients munches on a cookie in the presence of other people, it is almost certain to arouse conversation.  It is therefore a walking advertisement for us.

[Pl. Ex. 2, p. 14].

While he did not advertise, Siegal and his diet were featured on television news programs.  In 1985 a local news "magazine" show, Montage, featured Siegal and his "Cookie Diet."  [DE 82, pp. 69-70; Pl. Ex. 5].  Beginning in 2003, after he entered into his agreement with Moulavi, Siegal and his "Cookie Diet" were featured on a number of other news programs, including Good Morning America.  [DE 82, pp. 167-68; Pl. Ex. 5].[13]  At his

---

[12] The copy of the manual introduced into evidence had a copyright date of 1990.  [Pl. Ex. 2].

[13] Moulavi and Siegal each take credit for placing the television stories that aired after 2002.  [DE 82, pp. 77-78, 172;  DE 84, p. 44].

suggestion, Siegal was identified in each of these programs as the creator of the Cookie Diet [DE 82, pp. 78-80], although he did admit in one interview: "I hate to be called the Cookie Diet.  It's a diet that uses a cookie as an adjunct to losing weight."  [Def. Ex. 154].

### B.   Moulavi Enters the Picture

In 2001, Siegal considered selling his medical practice.  [DE 83, p. 100].  Robert Geiss, an attorney and healthcare business consultant, introduced him to Moulavi.  Rather than sell his practice, Siegal entered into the 2002 licensing agreement with Moulavi.  [DE 83, pp. 93, 95, 97, 125].

As part of their agreement, Moulavi received training at Siegal's clinics, observing patient interactions, operation of the phone center, the dispensing of medication in compliance with Florida law, and other administrative features of the practice.  [DE 83, pp. 127-28; DE 89, ¶ 13].  Moulavi estimated that he spent at least part of 15 days at Siegal's clinics, and testified that during these visits he never heard anyone use the term Cookie Diet. [DE 83, pp. 128-29; DE 84, p. 8].  He recalled that Siegal's call center operators worked from a script and spoke of the One-Meal-A-Day Diet.  [DE 83, p. 129].  Similarly, Geiss testified that in his discussions with Siegal, and during his three visits to Siegal's clinics, he never heard Siegal or his staff mention the Cookie Diet.  [DE 83, pp. 94, 104-05].  Although Moulavi and Geiss did not hear "Cookie Diet" used at Siegal's clinics, the Court credits the testimony of Siegal, his patients and staff that they routinely used the term to describe his weight-loss program.

Siegal and Moulavi disagree as to when they first discussed the term "Cookie Diet."

11

Moulavi testified that when they entered into their first agreement, Siegal never mentioned that he had a trademark called the Cookie Diet. [DE 83, p. 133]. Moulavi claims he first heard the phrase a couple of months before he opened his first clinic in Boca Raton, Florida, in September 2002 [DE 83, pp. 130, 133], when he was interviewed by a local reporter about the clinic, and the reporter described the diet as "the cookie diet." [DE 83, pp. 134-35, 277-78]. Moulavi liked it, and immediately began using Cookie Diet to identify his program. His wife began to answer the phones "the Cookie Diet," and Moulavi put a sign on the door of his Boca Raton center with words to the effect "Welcome to the Cookie Diet." [DE 83, p. 136].

Siegal, however, said they first spoke of the mark before they entered into the 2002 agreement, when Siegal told Moulavi that, while he had no objection to Moulavi and his staff using the term Cookie Diet in conversation with patients, he did object to Moulavi's "flagrant" use of the term, such as in advertising. [DE 82, pp. 96-97, 128].

However he learned of it, Moulavi clearly liked the mark and wanted to use it to market his weight-loss clinics. According to Moulavi, he first began to label Siegal's cookies with "Cookie Diet" in approximately November, 2002. He was prompted to do so by a call from an emergency room doctor regarding one of Moulavi's patients who had collapsed on a golf course and had a package of cookies in her golf cart. The doctor wanted to know the contents of the cookies, and was frustrated that the package was not labeled with this information. [DE 83, pp. 137-38]. According to Moulavi, Siegal refused to provide

individual nutritional labels for each package of cookies [DE 83, p. 138],[14] which prompted Moulavi to print a simple label on Avery stickers that said "For info call [the phone number for the Boca center] Cookie Diet tm."[15] [DE 83, p. 138; Def. Ex. 9]. Moulavi's staff placed the stickers on the glassine wrapper on each package, already imprinted with "Siegal," and in time shipped the stickers to franchisees with instructions to mark each package. [DE 83, pp. 138-140; DE 84, pp. 63-64; Def. Ex. 9].

Moulavi testified that, while operating as the franchisee and licensee of Siegal, he created different labels with the name Cookie Diet and used those labels on the majority of the cookie packages Moulavi sold. [DE 84, pp. 54-60, 75-76; Def. Ex. 9].

### C.    Moulavi Aggressively Markets His Weight-Loss Centers

Unlike Siegal's "old school" approach, Moulavi actively marketed his weight-loss centers, and those of his franchisees. [DE 84, pp. 45-47]. At first Moulavi received help from the marketing department of the Canadian medical facility he previously operated. [DE 83, p. 143; DE 84, pp. 52-53]. He also purchased the book "PR for Dummies" and began writing press releases that included contact information for both Moulavi and Siegal, and sent them "everywhere," concentrating on local South Florida stations and national media.[16]

---

[14] Siegal denied this and claimed he provided Moulavi with individual nutritional labels, although Siegal could not recall when he began to do so. [DE 82, pp. 177-79].

[15] Moulavi had also opened a center in Montreal. That center applied similar stickers to cookie packages, with the phone number of the Montreal clinic. [DE 83, pp. 138, 140, 143].

[16] Moulavi directed his marketing efforts to South Florida, the geographic area reserved to Siegal under their agreement, believing there might be local interest in the story, and that any story about their common weight-loss program could benefit Moulavi. [DE 83, p. 145].

[DE 83, pp. 144-46; DE 84, pp. 45-47; Def. Ex. 32, 57, 91, 135]. Sometime in 2003 Moulavi hired a Florida public relations firm and paid it "tens of thousands of dollars" to market his program. [DE 84, p. 52].

Moulavi promoted his centers, and in time those of his franchisees, in a variety of ways and often, but not always, made reference to the Cookie Diet. Early on, in January 2003, Moulavi organized a weight-loss conference in Boca Raton, where he, Siegal and others spoke. [DE 83, pp. 152-53]. Pamphlets and product samples marked Cookie Diet were available at the conference. [DE 83, pp. 152-53]. In late 2003, or early 2004, Moulavi's Orlando center purchased possibly 500 water jugs for distribution to patients, marked The Cookie Diet and Siegal Weight Management. [DE 83, pp. 158-59; DE 89, ¶ 25; Def. Ex. 147]. Moulavi's wife managed his Boca Raton center, and sometime in 2003, Moulavi had a magnetic sign made for the side of her car that read: "Siegal Medical Weight Management, Physician Supervised, 'Cookie Diet,'" and included a telephone number and website. [DE 83, pp. 165-66; DE 89, ¶ 24; Def. Ex. 11]. Moulavi's trailer, used to pick up products from Siegal's bakery, was marked "Smart for Life, Weight Management Centers," with a phone number and website, and "The Cookie Diet." [DE 83, pp. 36-37; DE 89, ¶ 23; Def. Ex. 13].

At least two of Moulavi's California franchisees, since 2005, have included "Cookie Diet" on their permanent outdoor signage. [DE 83, pp. 188-91; Def. Ex. 58]. Beginning sometime in 2005, Moulavi made available to his franchisees, when they signed a lease, large banners announcing the opening of the Siegal Smart for Life weight-loss centers; the banners

14

included the words Cookie Diet.  [DE 83, pp. 217-18; Def. Ex. 150].  Moulavi actively sought media attention when a new franchise opened, and at his request Siegal made an appearance at those openings on a number of occasions.  [DE 83, p. 161].

There is no question that, while operating under his agreements with Siegal, Moulavi identified his weight-loss centers and those of his franchisees, and their products, to many consumers as the Cookie Diet.  That consumers made the association between the Cookie Diet and Moulavi's programs is reflected in the many e-mails that came into Moulavi's call center from customers inquiring about the Cookie Diet.  [DE 83, pp. 218-20; Def. Ex. 66].

While Moulavi was operating under the license and franchise agreements, his marketing of the Cookie Diet was almost always in association with the name Siegal.  [DE 83, pp. 108-09].  Although Moulavi changed the name of his weight-loss centers several times, for most of the period of 2002 through 2006 the business name included "Siegal."  At first, Moulavi used the name "Siegal Weight Management."  Sometime in 2003 he changed to "Siegal Medical Weight Management."  In time, Moulavi developed his own trademark, Smart For Life, and by late 2004 his centers were called "Siegal Smart for Life."[17]  Finally, in 2006, at or around the time the agreement was terminated, Moulavi dropped the name Siegal all together, and simply called his centers Smart For Life.  [DE 83, pp. 162-63].

There is no doubt that the weight-loss program Moulavi marketed was, in all key respects, that created by Siegal.  Moulavi did make some modifications to conform to

---

[17] Moulavi also developed the trademark Nothing Tastes as Good as Thin Feels, and a trade symbol called the Wavy Lady.  [*See e.g.*, DE 84, p. 78].

15

guidelines established by the American Society of Bariatric Physicians, such as including measurement of patients' body fat as part of the medical oversight.  In time Moulavi also authorized some patients to consume up to 1,000 calories a day.  [DE 83, pp. 130-32].  Moulavi marketed the diet as that created by Siegal, and testified that an important aspect of his agreement with Siegal was the right to associate his centers with Siegal's 35- year history.  [DE 84, pp. 24, 37].[18]

Moulavi has had considerable success in building his franchise network, which now has 32 U.S. franchisees, located in ten states.  [DE 83, pp. 170-72; Def. Ex. 33].  Many have arranged for local media coverage.  [DE 83, p. 172].  Moulavi introduced evidence of eight local television news stories, broadcast in twelve different cities throughout the United States, during the course of the parties' agreements.  [DE 83, pp. 176-88; Def. Ex. 19, 41, 45, 111, 115, 116, 118, 120, 144, 154].  Each of these news stories made reference to the Cookie Diet, and nearly all of them identified the weight-loss program as Siegal Weight Management and reported that the diet had been developed by Siegal 40 years ago.  [*Id.*].  In addition, in January, 2003, Good Morning America broadcast a story on the Cookie Diet that included interviews of Siegal and patients of Siegal and Moulavi.  [DE 82, p. 78; DE 84, p. 46].  Defendants' franchisees have also been the subject of newspaper and magazine articles in various publications around the country that identified their program as the Cookie Diet, and at the same time often made reference to Siegal.  [Def. Ex. 40, 44, 47, 48, 49, 52,

---

[18] Moulavi alternatively spoke of Siegal's 35-year, or 40-year, history.

16

132].

Similarly, Moulavi and his franchisees placed a considerable number of advertisements in  newspapers and other publications that included the mark Cookie Diet, and many of which included the word Siegal.  [*See generally,* DE 83, pp. 193-213; Def. Ex. 15-17, 20, 23, 24, 26, 27, 29-31, 42, 43, 46, 50, 51, 53, 90, 127, 133].

Moulavi's marketing materials, however, did not consistently include the phrase Cookie Diet.  In 2004, Defendants prepared a marketing manual for franchisees, which did make reference to the Cookie Diet.  [DE 83, pp. 147-49; Def. Ex. 87].  In contrast, the following year they prepared and provided to all of Moulavi's sub-franchisees a rather lengthy document, The Siegal Smart For Life Weight Management Centers Marketing Training guide, which offered marketing instruction but made no mention of the Cookie Diet. [DE 82, pp. 117-18; DE 89, ¶ 21; Pl. Ex. 57].  The same was true for Defendants' Uniform Franchise Offering Circular, written for Moulavi's prospective franchisees in March, 2006. [DE 82, pp. 147-148; Pl. Ex. 59].  Further, before September, 2006 Moulavi did not license to his sub-franchisees the right to use the Cookie Diet [DE 84, pp. 14-19; Pl. Ex. 58], a fact at odds with Moulavi's claim that he owned the Cookie Diet trademark and wanted his sub-franchisees to use it in their promotional materials.

### D.    Conflict Arises Over the Cookie Diet

The parties agree on this: Siegal strongly objected to Moulavi's use of the phrase Cookie Diet when marketing Siegal's weight-loss program and products.  [*See e.g.*, DE 84, pp. 78-79].  This became clear at least as early as the Fall of 2002, when Siegal called

Moulavi's Boca Raton center and heard the phone answered "The Cookie Diet."  Siegal was angry, told Moulavi he wanted the program called Siegal Weight Management, and said not to call it the Cookie Diet.  [DE 83, p. 136].

Not long after that, at the Boca Raton conference, Siegal became "very upset" when he saw the pamphlets or products marked Cookie Diet, and told Moulavi not to use the mark, explaining it's "cute . . . and it degrades the doctor and the medicine."  [DE 82, p. 99; DE 83, pp. 153-55].  There were a number of other instances like this, and every time Siegal learned that Moulavi had used the phrase to refer to his diet, he "complained bitterly."  [DE 82, pp. 98-99, 113-14].

A pattern developed, at least initially, where to appease Siegal when he complained, Moulavi would discontinue his use of the term for a period of time.[19]  [DE 82, pp. 99, 139-41; DE 83, p. 155; DE 84, p. 76].  Moulavi, however, strongly believed that the "Cookie Diet" was a great marketing tool, and did not share Siegal's view that promoting it diminished the program.  Over time, Moulavi increasingly used and sought to gain control of  the mark, and avoided bringing this to Siegal's attention.  Although Moulavi denied intentionally hiding his use of the Cookie Diet mark from Siegal [DE 84, p. 77], this is contradicted by certain of his actions and statements.  For example, Moulavi offered this explanation for his failure to discuss his use of the mark with Siegal when they entered into

_____

[19] Moulavi testified that he accommodated Siegal because Siegal had threatened to stop supplying cookies if Moulavi did not follow his directions.  [DE 84, pp. 38-42, 76-77, 79-81].  Siegal denies making any such threat.  [DE 82, pp. 187-88].

the 2004 agreement:

> I did not specifically discuss Cookie Diet.  But he knew we were developing
> it.  It was a sore point for him.  He didn't like it.  I didn't want to put it in his
> face.

[DE 84, p. 78].  As another example, in August 2005 Moulavi filed a federal trademark

application for The Cookie Diet.  [DE 89, ¶ 18; Pl. Ex. 55, Tab 1].  He also testified that

sometime in 2004 he looked into purchasing the domain name cookiediet.com, but found that

the price was too high.  [DE 83, pp. 168].  He did this without notification to Siegal.

Moulavi claims that after the 2004 agreement was signed, Siegal accepted Moulavi's

use of the Cookie Diet and no longer complained about it.  [DE 84, p. 112].  This Court

credits Siegal's testimony that before the termination of the agreement he was not aware of

the full extent to which Moulavi was using the mark.  [*See e.g.*, DE 82, pp. 98, 105, 113-14,

128].

### E.    The Agreement Is Terminated and Both Parties Aggressively Market Their Cookie Diet

After Moulavi terminated the agreement, Siegal learned that Moulavi had stepped up

his marketing of his Cookie Diet.  [DE 82, pp. 120-22, 128; DE 83, pp. 49, 254-55].  Siegal

demanded that Moulavi stop using the mark, and when Moulavi refused [DE 82, pp. 120-21],

Siegal was persuaded by his son to abandon his "low key" marketing strategy, develop a

website with the Cookie Diet mark, create new packaging for the cookies with prominent

lettering "Dr. Siegal's Cookie Diet" and a photo of Siegal, and use the Internet and drug

stores to directly market the cookies to consumers.  [DE 82, pp. 122-25, 191, 233-34; DE 83,

pp. 49-50, 55-57, 66, 77-79; Pl. Ex. 21b].

For his part, Moulavi began to label the new products he was selling "Cookie Diet."

[DE 83, pp. 164-65, 167-68; Def. Ex. 11].  In late July or August, 2006, Moulavi purchased

the domain name cookiediet.com.  [DE 83, pp. 169, 207; Def. Ex. 12].  In August, 2006, just

after the termination, Moulavi filed two more federal trademark applications for the mark

The Cookie Diet.  [DE 89, ¶ 19, 20; Pl. Ex. 52, 54].[20]  And, in February, 2007 Moulavi

registered The Cookie Diet as his trademark with the State of Florida.  [Def. Ex. 59].

Both parties' overt promotion of their diet programs as the Cookie Diet created, as the

parties stipulate, confusion in the marketplace as to the origin of the Cookie Diet and related

products, which led to the filing of these motions for preliminary injunction.

**IV.     Conclusions of Law and Credibility Assessments**

Injunctive relief is expressly authorized by the Lanham Act in cases of trademark

infringement and unfair competition.  15 U.S.C. § 1116(a).  To prevail on a motion for

preliminary injunction a party must establish:  (1) a substantial likelihood of success on the

merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) that

the threatened injury to the movant outweighs the threatened harm to the party to be

enjoined, and (4) that the preliminary injunction will not disserve the public interest.

*McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).  The parties agree

that the only dispute concerns the likelihood of success on the merits, and that the party that

---

[20] Moulavi's three federal trademark applications are currently pending.

establishes common law ownership of the trademark Cookie Diet will establish this and the other requirements of a preliminary injunction.[21]  The parties must establish their ownership of the trademark by a preponderance of the evidence.

Section 43(a) of the Lanham Act forbids unfair trade practices involving infringement of trademarks; it is "remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d

---

[21] Specifically, the parties have stipulated as follows:

28.  In the present matter, the likelihood of success on the merits of a trademark infringement case lies with whichever party is deemed to be the owner of the COOKIE DIET™ trademark.

29.  Whichever party in the present action is determined to be the owner of the COOKIE DIET™ mark would suffer irreparable harm if the other party is allowed to use the COOKIE DIET™ trademark.

30.  The potential injury to the party that is determined by this action to be the owner of the COOKIE DIET™ trademark in allowing the other party to use the COOKIE DIET™ mark or any derivation of the COOKIE DIET™ in any territory that overlaps or involves the natural expansion of the owner's prior rights outweighs the injury to such other party from being enjoined from use of the COOKIE DIET™ mark or any derivation of the COOKIE DIET™.

31.  Enjoining the party that is determined by this action to be the non-owner of the COOKIE DIET™ trademark would be in the public interest.

32.  The party that is determined by this action to be the owner of the COOKIE DIET™ mark is entitled to a preliminary injunction preventing the party that is determined by this action to be the non-owner from using the COOKIE DIET™ mark or any derivation of the COOKIE DIET™ in any territory that overlaps or involves the natural expansion of the owner's prior rights.

33.  The only issue left to be resolved in the case is who owns the COOKIE DIET™ trademark.

[DE 89, ¶¶ 28-33].

21

1188, 1193 (11th Cir. 2001) (citations omitted); 15 U.S.C. § 1125(a).  Here, both parties

claim a common law right to the trademark Cookie Diet and agree that under common law,

trademark rights are "appropriated only through actual prior use in commerce."  *Planetary*

*Motion*, 261 F.3d at 1193 (quoting *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018,

1022 (11th Cir. 1989)).  While the test for "prior use" has been expressed by the Eleventh

Circuit with varying language, the Court has repeatedly spoken of the plaintiff's burden to

establish "adoption" and "use."  In *Planetary Motion*, for example, the Court borrowed from

other Circuits this test for "prior use" sufficient to establish ownership:

> Evidence showing, first, adoption, and, second, use in a way sufficiently
> public to identify or distinguish the marked goods in an appropriate segment
> of the public mind as those of the adopter of the mark, is competent to
> establish ownership, even without evidence of actual sales.

261 F.3d at 1195 (footnotes omitted) (citing *New England Duplicating Co. v. Mendes*, 190

F.2d 415, 417-18 (1st Cir. 1951), and *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d

1194, 1200 (9th Cir. 1979)).  In *Tally-Ho*, the Court expressed a similar test, in that case

borrowed from Florida law,[22] requiring the plaintiff to prove:

> (1) [it] first adopted and used a certain name . . . in a certain market or trade
> area, as a means of establishing good will and reputation and to describe,
> identify or denominate particular services rendered or offered by it . . . and to
> distinguish them from similar services rendered or offered (or similar goods
> marketed) by others, and
>
> (2) through its association with such services or goods the plaintiff's

_____

[22] The Court in *Tally-Ho* analyzed the plaintiff's motion for preliminary injunctive relief for
trademark infringement under section 43(a) of the Lanham Act and Florida common law, and used
the same reasoning to resolve all claims.

[trademark] has acquired a special significance as the name of the services rendered (or goods marketed) by the plaintiff in its trade area . . . .

889 F. 2d at 1026 (citing *American Bank v. First American Bank & Trust*, 455 So. 2d 443, 445-46 (Fla. 5th DCA 1984)).  Thus, the party that first adopts and uses the trademark in association with its goods and services, sufficient to form an association between the two in the public mind, establishes its common law right to the mark.

A.      **Siegal Was the First to Adopt and Use the Trademark**

The evidence is overwhelming that Siegal was the first to identify his weight-loss program and products as the Cookie Diet, and that he did so as early as 1975.  The Court finds the testimony of Siegal, his staff and patients of many years credible, and specifically finds that Siegal and his staff routinely identified his services and products as the Cookie Diet in their daily interactions with patients, and that patients and other members of the dieting public came to associate them with the Cookie Diet.  In addition to this testimony, a number of exhibits provide contemporaneous corroboration of Siegal's use of the mark. An example is the manual Siegal wrote in 1990 and distributed to all of his doctor customers, called "Starting an Obesity Practice" ("When new patients call . . . [y]our receptionist will be told, "I want to go on the cookie diet").  [Pl. Ex. 2, p. 14].  Another is the narrative in the 1985 Montage television program that called Siegal's program the Cookie Diet [Pl. Ex. 5], as is Moulavi's own website in August, 2006 ("Dr. Siegal developed The Siegal System$^{TM}$ (which the media and the doctor's own patients affectionately refer to as "The Cookie Diet") more that thirty years ago.").  [Pl. Ex. 22]. Additional corroboration is found in e-mails sent

by patients to Siegal inquiring about his Cookie Diet.  [Pl. Ex. 13, 15-19].

Defendants insist, however, that Siegal never adopted the trademark.  "Whether a trademark has been 'adopted' is a factual finding whose resolution may include elements of subjective intent.  As in such questions generally, intent is illuminated by the surrounding circumstances and objective evidence."  *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1473 (Fed. Cir. 1987).  Defendants argue, not without reason, that Siegal's expressions of dislike of the trademark demonstrate that he never intended to adopt the mark.  In isolation, these remarks might well lead to a finding that Siegal did not adopt the mark.

Adoption, however, must be measured under the surrounding circumstances.  Key among these was Siegal's opposition to any form of advertising.  Instead, he chose to grow his medical practice by word-of-mouth, and the nickname favored by his patients, staff and even the media for his weight-loss program was the Cookie Diet.  Siegal used the term with his patients and staff, as they did with one another, and made no effort to stifle that use.  Defendants have cited no authority holding that one cannot adopt a trademark by oral use;[23]

---

[23] Defendants cite one case, *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1264-66 (5th Cir. 1975), for the proposition that conversational use of the mark by Siegal and his staff with patients in his clinics is insufficient evidence of his adoption of the mark.  [DE 90, p. 25, ¶ 87].  The case does not stand for this proposition.  The use at issue in *Blue Bell* was the Farah corporate headquarters' distribution of one pair (a sample) of its marked slacks to each of its 12 regional sales managers.  Each sales manager purchased the pair of slacks, but only as an accounting device to charge them in the event of a loss.  No sale was made to customers until a later date, and the transaction remained internal to Farah's employees.  Because there was no actual use in trade, the court rejected Farah's assertion that the transaction established its prior use.  In contrast, Siegal and his staff used the disputed trademark in connection with the sale of Siegal's goods and services to his patients – members of the consuming public.

to the contrary, Defendants offer, as an example of their own adoption of the trademark, Mrs. Moulavi's answering the telephone of the Boca Raton clinic with "Cookie Diet." The Court concludes that Siegal's and his staff's repeated verbal identification of his program as the Cookie Diet is clear evidence of his adoption of the mark.

The other key circumstance this Court must consider is Siegal's belief that it was unprofessional to promote his medical weight-loss program with a "cute" name. Siegal believed the Cookie Diet sounded unprofessional – too much like a fad diet – and would not use it on signs, documents, or in any other formal manner. He chose instead to call his diet the One-Meal-A-Day Diet and his medical practice Siegal Weight Management, and used these marks on signs and written materials. In this context the Court does not understand Siegal's statements that he did not like the name as a wholesale rejection of the trademark, and looks to Siegal's actions to illuminate his intent. Probably the best demonstration of his intent is the 1990 flier in which Siegal solicited customers for his "Siegal Cookie Diet$^{TM}$." This one exception to Siegal's no-advertisement policy is direct evidence of his adoption of the mark.

That Cookie Diet was favored and used by patients, media and members of the public to describe Siegal's program is further evidence of his ownership of the trademark. Inasmuch as the ultimate purpose of a trademark inquiry is to determine if members of the public identified Siegal's program as the Cookie Diet, "it makes no sense to look only at [Siegal's] use apart from the complementary use by the public." *Nat'l Cable Television Ass'n, Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1577 (Fed. Cir. 1991). Courts

have thus recognized that the public's use of a mark can inure to the benefit of the owner of the goods and services it describes.

> "[A]bbreviations and nicknames of trademarks or names used *only* by the public give rise to protectable rights in the owners of the trade name or mark which the public modified."  *Nat'l Cable Television Assoc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1577 (Fed. Cir. 1991).  Such public use of a mark is deemed to be on behalf of the mark's owners.

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999).  Siegal testified that Cookie Diet was coined by a patient, and the mark can be fairly understood as the derivation of two trademarks licensed to Moulavi: The Siegal Cookie and the Siegal Diet Program.  It served as a nickname for the more businesslike names Siegal preferred, and fostered strong recognition of Siegal's diet among members of the dieting public.

By the time Siegal entered into a business relationship with Moulavi, Cookie Diet had acquired a special significance as the name of Siegal's weight-loss program among his patients and other members of the public interested in his diet.  Siegal thus had common law ownership of the trademark throughout South Florida when he and Moulavi entered into the 2002 agreement.[24]

---

[24] It would appear that in 2002 Siegal's ownership extended beyond South Florida, to various locations around the country where his program had become known among patients and doctors. The present record is inadequate to determine the geographic boundaries of Siegal's trademark outside South Florida at the time he entered into the 2002 agreement, and for reasons that will become clear, the Court need not undertake this analysis.

**B.      After Siegal, Moulavi Also Adopted and Used the Trademark**

Moulavi first used Cookie Diet in 2002 and there is no question that over the following four years he adopted and used it, and actively sought to associate it with his weight-loss centers.  Moulavi and his franchisees used the trademark in press releases and advertisements, which fostered newspaper and television coverage around the country.  He included Cookie Diet on signs on his car and trailer, and on a banner offered to new franchisees, and some of his franchisees included Cookie Diet on permanent outdoor signs. Moulavi also added Cookie Diet to product labels, and included it on pamphlets at the Boca Raton conference, on the water jug prepared by the Orlando center and in the marketing manual he prepared for franchisees in 2004.  Although Moulavi's use was not always consistent, the record reflects that he did adopt and use the mark during his four-year license and franchise agreement with Siegal, sufficient to form an association for the public between the trademark and his goods and services.

Moulavi contends that, to the extent Siegal had common law rights to the trademark Cookie Diet, he abandoned those rights by discontinuing his use of the mark (at least until Moulavi terminated their agreement in August, 2006), and Moulavi thereby acquired the common law right to the trademark.  The Court concludes, however, that Siegal never abandoned the trademark.

**C.      Siegal Did Not Abandon the Trademark**

To establish abandonment the Defendants must prove that (1) Siegal ceased use of Cookie Diet, and (2) in doing so, he intended not to resume its use in the reasonably

foreseeable future. *Cumulus Media, Inc. v. Clear Channel Comm., Inc.*, 304 F.3d 1167, 1173-74 (11th Cir. 2002).[25]  Although the inquiry is not the same as that required for "adoption," both call upon the Court to consider Siegal's intent and address the apparent conflict between his "dislike" and his use of the trademark Cookie Diet.

Siegal remained consistent in his use of the trademark, both before his agreement with Moulavi and during the four years of their contractual relationship; that is, he avoided its use in written materials, signage and advertising, but continued its conversational use with patients and participated in television news stories about "his Cookie Diet."  Siegal did tell Moulavi on a number of occasions that he did not like the mark and did not want it used to promote his weight-loss program.  During this same period of time, however, Siegal appeared on multiple television news programs knowing that the focus of the story would be the idea that cookies could lead to weight loss, and suggesting to the reporters that he be identified in the story as the creator of the Cookie Diet.  This Court finds that Siegal's actions and words, taken as a whole, do not evidence an intent to abandon the mark.

On his own website, launched in 2003, Siegal wrote: "Although you have probably heard of our program as "The Cookie Diet™," it is actually called the One-Meal-A-Day Diet."  [Pl. Ex. 6].  In this example, as in many others, Siegal continued to use the trademark Cookie Diet, aware of – and wanting to benefit from – its strong public association with his

---

[25] This Circuit has recognized that the burden of proof a defendant bears on the affirmative defense of abandonment is "strict," without deciding whether this requires the defendant to present "clear and convincing evidence" or a "preponderance of the evidence." *Cumulus Media*, 304 F.3d at 1175, n.12.  Under either standard, the Defendants here have not established abandonment.

program, while at the same time promoting the trademark he believed presented a more professional image.  Siegal's use of  the "TM" symbol in this instance is evidence of his claim of ownership of the trademark.  Moulavi's website, in 2003, included a statement that Siegal had developed the diet, "which the media and the doctor's own patients affectionately refer to as "The Cookie Diet" . . . ."  [Pl. Ex. 22].  Moulavi testified that he included this statement on his website at Siegal's insistence.  These actions by Siegal are evidence of his continued use and adoption of the mark.

Owners of trademarks have the right to choose how to use their marks.  Siegal chose to restrict its use primarily to conversation with patients, and the Court credits Siegal's testimony that he told Moulavi he should do the same.  He also participated in television interviews knowing that the Cookie Diet would be a "hook" for the story.  Defendants incorrectly equate Siegal's distaste for use of the mark beyond these limitations as an intent to abandon the mark.

Defendants also argue that Siegal's failure to make any reference to the Cookie Diet in any of his written agreements with Moulavi, when those agreements licensed to Moulavi multiple other trademarks, is evidence of Siegal's abandonment of the Cookie Diet mark. Moulavi reasons that, had Siegal claimed ownership of the Cookie Diet mark, Siegal would have said so in the 2002 agreement.  [DE 83, p. 133].  Siegal counters that he deliberately did not license the Cookie Diet trademark to Moulavi for fear he would overuse it.  [DE 82, p. 97].  Rather, according to Siegal, he reserved his exclusive right to this and other non-licensed trademarks with general language in the 2002 and 2004 agreements.  [*See* Pl. Ex.

29

44, ¶ 10(b); Pl. Ex. 46, ¶ 1(h)].  Moulavi replies that by the time they signed the 2004

agreement, Siegal knew Moulavi was actively using the Cookie Diet mark [DE 84, pp. 11,

42, 78], and that he, Moulavi, included in the 2004 agreement a reservation of right to his

own trademarks, which, Moulavi claims, included Cookie Diet.  [*Id.*].[26]

Moulavi would have this Court infer from Siegal's silence his intent to abandon the

mark and, for that matter, his failure to adopt the mark.  The Court is unwilling to draw this

inference where there is direct evidence, recited above, that Siegal used, and intended to use,

the mark in a consistent fashion for the many years leading up to his agreement with

Moulavi, and during the four years of their contractual relationship.  For these reasons, the

Court concludes that Siegal did not abandon the Cookie Diet trademark.

### D.    Moulavi's Use of the Mark Inured to the Benefit of Siegal

Under common law, a trademark is acquired "only within those markets where the

mark has been used and its meaning [has] become known."  *Cotton Ginny, Ltd. v. Cotton*

*Gin, Inc.*, 691 F. Supp. 1347, 1352 (S.D. Fla. 1988) (citations omitted).  Siegal clearly

established his ownership of the trademark Cookie Diet in South Florida.[27]  Moulavi's four-

---

[26] Moulavi was referring to this language:

WHEREAS, U.S. Medical is currently using marks bearing the name Siegal, and
agrees to assign and transfer any right in, interest in and/or title to any and all marks
bearing the name Siegal *(but not any others)* being used by U.S. Medical to SMLC
pursuant to the terms of this Agreement[.]

[Pl. Ex. 46, p. 1] (emphasis added).

[27] As previously noted, Siegal may have acquired ownership of the trademark outside of South
Florida by virtue of his sales of cookies to out-of-state doctors before 2002.  The evidence presented

year use of the trademark, while operating under the parties' franchise and license agreements, substantially furthered an association among consumers between the mark and Siegal's weight-loss program, and in doing so established for this Court Siegal's ownership of the mark throughout the United States.

In both the 2002 and 2004 agreements, Siegal licensed to Moulavi the right to use the various Siegal trademarks. Trademarks may be licensed so long as the licensor "retains some degree of control over the quality of the goods or services marketed thereunder." *E.G.L. Gem Lab Ltd., v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000). There is no debate here that Siegal maintained the requisite degree of control over Moulavi's use of the Siegal trademarks, as evidenced by the terms of the parties' written agreements. Notably, Siegal maintained almost complete control over the trademarked products, as they were manufactured and packaged by his own company. He also trained Moulavi in his implementation of the weight-loss program and retained the right to approve Moulavi's marketing materials.

> [A] trademark may be acquired and sustained solely through use by a licensee, provided the licensor exercises the requisite degree of control, as the use of the mark by the licensee inures to the benefit of the licensor.

*E.G.L. Gem Lab Ltd.*, 90 F. Supp. 2d at 300. During the four years that Moulavi promoted the Siegal trademarks (the trademarks expressly licensed to him), he expanded their influence in the United States and Canada. Moulavi recognizes that in the process he did not gain any

---

at the preliminary injunction hearing was inadequate for the Court to make this determination.

ownership rights in the Siegal marks, and that his use of those trademarks inured to the benefit of Siegal.  *See Cotton Ginny, Ltd.*, 691 F. Supp. at 1354.  If Siegal did not already have nationwide ownership of his Siegal trademarks, he undoubtedly acquired nationwide rights to those marks through his license to Moulavi.

This Court reaches the same conclusion regarding the trademark *not* licensed to Moulavi, but nevertheless used by him, the Cookie Diet.  That is, Moulavi's use of the Cookie Diet mark inured to the benefit of Siegal, such that Siegal now has nationwide ownership of the mark.

Moulavi chose to use the trademark Cookie Diet in close association with the Siegal marks.  For most of the four years of their franchise and licensing arrangement, Moulavi's clinics were named either Siegal Weight Management, Siegal Medical Weight Management or Siegal Smart for Life, and Moulavi used the Cookie Diet in conjunction with these names.[28]  The weight-loss program Moulavi offered was that created by Siegal, and the cookies, shakes, soups and drops Moulavi sold to his patients were manufactured by Siegal.  The Cookies, always the primary product, were labeled with the name Siegal; to the extent Moulavi added Cookie Diet labels they went alongside the Siegal name.  Moulavi and his franchisees actively promoted their weight-loss centers with the story of Siegal's creation of the diet decades earlier and the successful weight-loss of Siegal's patients [DE 84, p. 37],

---

[28] Moulavi argues that it was his weight-loss centers, not Siegal's three centers in South Florida, that he was promoting.  In fact, at least for a time, Moulavi did promote Siegal's centers when Moulavi targeted his press releases to the South Florida media.  The more important point here, however, is that Moulavi chose to promote his own centers with the Siegal name.

and typically reported that Siegal's diet had become known as the Cookie Diet.  By inviting Siegal to their center openings, Moulavi furthered the public's association between the Cookie Diet and Siegal's program.

Moulavi pursued his aggressive marketing strategy knowing the Cookie Diet had for many years described Siegal's program.  Although he and Siegal disagree how and when Moulavi first heard the term, Moulavi certainly knew at least as early as 2003, when Siegal launched his website, that Cookie Diet had for many years been a name for Siegal's program. This was confirmed for Moulavi with the multiple  television news stories about Siegal and his Cookie Diet that aired after the 2002 agreement was signed.  He also knew, from Siegal's repeated insistence that Cookie Diet not be used in formal marketing, that Siegal asserted control of the trademark.  And by not confronting the issue head-on with Siegal, Moulavi took the risk that after considerable efforts to market his program as the Cookie Diet, the franchise and license agreement would terminate and Moulavi would have a full-blown dispute with Siegal over the trademark.

Under all these circumstances, Moulavi's promotion of the Cookie Diet inured to the benefit of Siegal.

> [D]uring a licensing relationship, use of a mark *confusingly similar to the licensed mark* inures to the benefit of the licensor.  If a licensee wishes to create rights in a mark separate from those marks licensed to it, the licensee has an affirmative obligation to choose a mark sufficiently different from the licensed marks so that the public will not be confused into thinking the new mark belongs to the licensor.  The licensee trades upon the good will of the licensor at the licensee's peril.

*Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp. 1553, 1560-61 (M.D. Fla.

1988); *E.G.L. Gem Lab Ltd.*, 90 F. Supp. 2d at 300. Moulavi met this affirmative obligation to create his own distinctive marks when, while under license from Siegal, he developed the trademarks Smart For Life, and Nothing Tastes as Good As Thin Feels, and the Wavy Lady symbol. Each of these marks offers no opportunity for public confusion, and there is no debate that Siegal has no right to these marks.

In contrast, Moulavi appropriated the Cookie Diet from Siegal in an effort to benefit from Siegal's good will. In the process, he clearly furthered the association in the public's mind between the weight-loss program Siegal developed and the Cookie Diet, and extended the geographic scope of Siegal's ownership of not only his Siegal trademarks, but also the Cookie Diet trademark throughout the United States.

## V.   Conclusion

For the reasons given, this Court

ORDERS that Plaintiff's Motion for Preliminary Injunction [DE 2] is **GRANTED**, and Defendants' Motion for Preliminary Injunction [DE 30] is **DENIED**. Accordingly, this Court

PRELIMINARILY ENJOINS U.S. Medical Care Holdings, L.L.C. and Dr. Sasson Moulavi, and their officers, agents, servants, employees and representatives, and all those who act in concert or participation with them, from advertising, promoting, offering for sale, selling, or distributing in any manner weight management services or products in connection with or bearing the trademark Cookie Diet, or any mark that is confusingly similar to this

trademark, including as part of any Internet domain name or as part of the source code of any web page, or by making any other use of the trademark.

This Court further

ORDERS the parties to confer and make every reasonable effort to agree to: (1) a time frame for Defendants to phase out their use of the Cookie Diet trademark and (2) whether, pursuant to Fed. R. Civ. P. 65(c), Plaintiff shall post a bond and, if so, the amount of the bond. No later than **July 25, 2007** the parties shall file with the Court a joint status report that sets forth their agreement, or their respective positions, and, if appropriate, legal authority on these two issues. This Preliminary Injunction will not take effect until the Court has considered the parties' status report and issues an order setting forth a timetable for Defendants' full compliance with this Preliminary Injunction and addresses whether Plaintiff must post an injunction bond.

DONE and ORDERED in chambers at Miami, Florida this 13th day of July, 2007.


_____
CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Patricia A. Seitz
All counsel of record

35